**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**DAVID C.,**

                              **Plaintiff,**

**v.**                                                          **1:19-CV-606 (NAM)**

**COMMISSIONER OF SOCIAL SECURITY,**

                              **Defendant.**

_____

**Appearances:**

Ralph M. Kirk
Kirk & Teff, LLP
10 Westbrook Lane
Kingston, New York 12402
_Attorney for Plaintiff_

Peter W. Jewett
Social Security Administration
Office of Regional General Counsel - Region II
26 Federal Plaza - Room 3904
New York, New York 10278
_Attorney for Defendant_

**Hon. Norman A. Mordue, Senior United States District Court Judge**

**MEMORANDUM-DECISION AND ORDER**

**I.      INTRODUCTION**

        Plaintiff David C. filed this action under 42 U.S.C. § 405(g), challenging the denial of

his applications for Social Security Disability ("SSD") insurance benefits and Supplemental

Security Income ("SSI").  (Dkt. No. 1).  The parties' briefs are presently before the Court.

(Dkt. Nos. 9, 10).  After carefully reviewing the administrative record, (Dkt. No. 8), and

considering the parties' arguments, the Court reverses the denial decision and remands for further proceedings consistent with this Order.

## II.     BACKGROUND

### A.     Procedural History

Plaintiff applied for SSD and SSI benefits on June 27, 2016, alleging that he became disabled on November 10, 2014.  (R. 186–94).  Plaintiff asserted that he is disabled due to autism, social anxiety, depression, paranoia, and back complications.  (R. 222).  The Social Security Administration ("SSA") denied Plaintiff's application on August 30, 2016.  (R. 114–26).  Plaintiff appealed that determination and requested a hearing before an Administrative Law Judge ("ALJ").  (R. 127–28).  The hearing was held on July 31, 2018 before ALJ Michael J. Stacchini.  (R. 39–78).  On September 11, 2018, the ALJ issued a decision finding that Plaintiff was not disabled.  (R. 15–33).  Plaintiff's subsequent request for review by the Appeals Council was denied on March 22, 2019.  (R. 1–6).  Plaintiff then commenced this action on May 21, 2019.  (Dkt. No. 1).

### B.     Plaintiff's Background and Testimony

Plaintiff was born in 1987.  (R. 79).  He received his GED in 2007, and has past work experience as a caretaker at a fish hatchery, as a cashier at a hardware store, and as a laborer at a landscaping business.  (R. 223).

Plaintiff testified that he lives with his father.  (R. 53).  He stated that he gets along well with his family, and that he has regular contact with his mother and sister.  (R. 47).  Aside from his family, Plaintiff stated that he has no friends or acquaintances.  (R. 48–49, 53).  He noted that he can drive, but only leaves the house to attend medical appointments.  (R. 46).  Regarding his daily activities, Plaintiff reported that he spends much of his time watching

television, playing video games, eating, and sleeping.  (R. 240, 244).  Before his condition worsened, he stated that he was previously able to do some work, visit friends, and go to the store.  (R. 241).  He reported that he was limited in his ability to perform personal care and grooming due to a lack of interest and energy.  (R. 241–42).  He noted that his father prepares all of his meals.  (R. 241).  He stated that he could prepare something simple to eat, but cooking is generally "too stressful for [him]."  (R. 241–42).

Plaintiff's father also does all of the shopping and cleaning.  (R. 50–51, 243–44).  Plaintiff noted that he only leaves the house once a week for therapy because he is "scared of people" and "too anxious."  (R. 243).  He stated that he does not shop for anything because he does not have money, and noted that "the last thing [he] bought was a gift for his father a few years ago."  (R. 243).  He reported that he is unable to pay bills or manage a savings account. (R. 244).

Plaintiff reported that he has problems paying attention because "[his] mind wanders," and "[he] get[s] nervous."  (R. 246).  He stated that he is unable to finish what he starts because he "can't focus [and] feel[s] too depressed."  (*Id.*).  He noted that stress or changes in schedule "stop [him] from functioning" and make it so he "can't do anything."  (R. 247).  Plaintiff stated that he has trouble getting along with bosses, teachers and other people in authority because "they are mean, think [he is] stupid, [and] they want to hurt [him]."  (*Id.*).  When asked about how his mental impairments affect his ability to work, Plaintiff stated:

> It's hard to deal, like, in a retail setting with customers.  I get very anxious and I make mistakes because of it.  Even with other coworkers it's really challenging just navigating the social dynamic. So, when I get anxious or nervous, I kind of . . . lose my thought process, so it's hard to concentrate and do my job.

(R. 56).

Plaintiff stated that he was currently looking for a new place to live and that he had been accepted to live at an assisted living house, but had not yet moved in. (R. 54). He noted that he would be assigned a caseworker who would meet with him once a week and make sure he was taking care of his living space and assist him with grocery shopping if needed. (R. 64).

C. **Medical Evidence of Disability**

1. **Dr. Gina Cosgrove, Evaluating Psychologist**

In February 2014, Plaintiff saw Gina Cosgrove, Psy.D. for a psychological evaluation "due to concerns that he was on the autism spectrum." (R. 577). Dr. Cosgrove administered both an IQ test and the Autism Diagnostic Observation Schedule ("ADOS"). (*Id.*). The tests showed that Plaintiff had an average IQ of 99, and that he met the criteria for Asperger's syndrome. (*Id.*). Dr. Cosgrove noted that Plaintiff "has been unable to hold employment and has struggled with social relationships all his life." (*Id.*). She described Plaintiff as "anxious," "very inflexible," and a "very rigid thinker." (*Id.*). Dr. Cosgrove's findings detailed on the ADOS indicated that Plaintiff had a flat affect, poor gesture communication, reduced empathy, poor motivation/insights into adult responsibilities, and unresponsiveness to some social prompts. (R. 579).

In July 2016, Dr. Cosgrove prepared a medical source statement, in which she recounted her findings that Plaintiff demonstrated poor social interaction, cognitive rigidity, and social anxiety. (R. 469). She assessed that he had "good" attention, concentration, orientation, memory and information fund, but that his social insight was "poor." (R. 469–70). She opined that Plaintiff had limitations in the mental functioning areas of sustained concentration and persistence, social interaction, and adaptation. (R. 470–71). She also noted that Plaintiff had obsessive interests, poor self-direction, and low motivation for tasks. (*Id.*).

Dr. Cosgrove noted that she "only saw [Plaintiff] for the autism evaluation," which was based on two visits in January 2014.  (R. 469).

## 2. **Dr. Mary Gallagher, Treating Psychotherapist**

Plaintiff began outpatient psychotherapy with Mary Gallagher, Ph.D. in July 2015.  (R. 576).  Dr. Gallagher's initial treatment plan identified that Plaintiff's main problems related to his anxiety and depression.  (*Id.*).  She noted that Plaintiff had "excessive [and] persistent daily worry interrupting daily function," and that he had "diminished interest in activities [and] social withdrawal."  (*Id.*).

In February 2016, Dr. Gallagher wrote to Plaintiff's primary care provider, stating that:

> [Plaintiff] requires support from family for daily functioning skills such as grocery shopping, keeping [his] living environment clean and organized, getting a haircut, [and] doing laundry.  He is socially isolated and relies on family for social activities but often avoids family social activities.  He has difficulty remembering medical appointments.  He relies on [his] parent[s] to schedule appointments and to help him attend them.

(R. 574).  She further opined that Plaintiff had executive functioning deficits that were evidenced by "problems managing time, initiating tasks, switching focus, problems planning & organizing, [and] difficulty avoiding[,] saying[,] or doing the wrong thing."  (R. 575).

In July 2015, Dr. Gallagher prepared a medical source statement in which she noted that Plaintiff was "unable to engage in non-family activities outside the house" due to his fear of social judgment, "and therefore avoids social situations such as grocery shopping."  (R. 465).  Dr. Gallagher stated that Plaintiff applied "repetitive/rigid thinking to problem solve social situations."  (*Id.*).  She assessed that his continued struggles with depression and anxiety were expected to continue for an "extended" duration, and that his prognosis was "guarded." (*Id.*).  She found that Plaintiff had limitations in all areas of work-related mental activities.  (R.

466–67).  With regard to attention and concentration, she found that Plaintiff was "distractible and forgetful."  (R. 465).  She noted that Plaintiff "[d]oes not employ common everyday social behaviors because of general misunderstanding of pragmatics," and that his social anxiety make it "difficult for him to interact with others and function independently in a workplace." (R. 466–67).

In March 2017, Dr. Gallagher prepared a psychological assessment evaluating Plaintiff's progress.  (R. 567–70).  She reported that Plaintiff's "mood had improved with psychotropic medication," but that his "anxiety has continued to be problematic and prohibits him from leaving the house to grocery shop or engage in other independent functioning activities."  (R. 570).  She noted that his anxiety increases his social isolation and avoidance of social settings.  (*Id.*).  She stated that his deficits "interfere with his ability to care for himself, and that he required family support to maintain adaptive daily functioning skills."  (*Id.*).

### 3. NP Brian Callahan, Primary Care

In July 2015, Plaintiff saw Nurse Practitioner ("NP") Brian Callahan to reestablish primary care after not seeing him for several years.  (R. 452).  Plaintiff complained of insomnia, anxiety, depression, and difficulties with agoraphobia.  (*Id.*).  To address these issues, NP Callahan started Plaintiff on Paroxetine and Zolpidem.  (*Id.*).  Plaintiff initially reported some improvement in his symptoms, but by December 2015 Plaintiff complained that his anxiety was disrupting his life, that he was unable to go grocery shopping, and that he was dealing with an ongoing hoarding issue.  (*See* R. 444–47).  NP Callahan increased Plaintiff's Wellbutrin dosage.  (R. 445).  On December 31, 2015, NP Callahan noted an improvement in Plaintiff's ability to go to stores, which he attributed to the medications working.  (R. 441).  In March 2016, Plaintiff noted that he was still dealing with anxiety and agoraphobia.  (R. 437).

In February 2017, NP Callahan treated Plaintiff for cold symptoms.  (R. 500).  During
that examination, Plaintiff reported that his anxiety and social phobias were "stable," that he
was "staying organized and on schedule," and that he was "getting out to shop occasionally."
(*Id.*).  In March 2018, Plaintiff informed NP Callahan that he was "moving to an adult
residence," and he again informed NP Callahan that his anxiety and social phobias continued to
be "stable," that he was "staying organized and on schedule," and that he was "getting out to
shop occasionally."  (R. 497).

### 4.  Spectrum Behavioral Health

In March 2016, Plaintiff began receiving psychiatric treatment with various providers at
Spectrum Behavioral Health.  (R. 483).  Plaintiff was seen by Dr. Joan Schmugler at his initial
consultation.  (R. 483–87).  Plaintiff complained of anxiety, agoraphobia, depression, and
appeared sad, downcast, and anxious.  (R. 483–86).  Dr. Schmugler assessed that Plaintiff was
"friendly, attentive, communicative, casually groomed, . . . and relaxed."  (R. 485).  She noted
that "signs of mild depression [were] present," and described his demeanor as "sad" and noted
that he "appear[ed] downcast."  (*Id.*).  She found that his affect was "appropriate, full range,
and congruent with [his] mood."  (*Id.*).  She reported that Plaintiff's associations were "intact,"
his thinking was "logical," and his thought content appeared "appropriate."  (*Id.*).  Plaintiff's
short-term and long-term memory were "intact," and his cognitive functioning was
"appropriate."  (*Id.*).  Dr. Schmugler assessed that his insight and judgment appeared "fair,"
and noted that he exhibited "no signs of hyperactive or attentional difficulties."  (*Id.*).

At a follow-up appointment Plaintiff reported that he had not been able to go outside or
shop for years, and expressed fears of social judgment.  (R. 490).  Plaintiff stated that he often

loses control of his anger and that there had been no improvement in his anxiety symptoms, which affected his sleep and avoidant behavior. (R. 492).

In June 2017, Plaintiff began treating with NP Hani Khalil. (R. 552). During the initial evaluation, Plaintiff complained of continued anxiety, and he recounted that "for years he struggle[d] with anxiety [and] was picked on at his job." (*Id.*). And while he reported that some of his symptoms were less frequent or intense, his sociability difficulties continued at the same level. (*Id.*). At the follow-up session with NP Khalil, Plaintiff reported that he spends most of his time playing video games, and that he had done so for years. (R. 550). In September 2017, Plaintiff attended a session with his father, who reported that Plaintiff spends all day in his room, avoids social interaction, and is "very sad and anxious all the time." (R. 547). Plaintiff agreed with his father that he was not motivated or interested in doing anything other than playing video games, and that his anxiety, depression, social isolation, and feelings of worthlessness had worsened. (*Id.*).

Throughout the remainder of 2017, Plaintiff continued to report symptoms and behaviors of anxiety and depression, and had observable psychiatric signs that included: dysphoric, anxious mood; depressed, blunted, constricted affect; poor attention; and impaired judgment. (*See* R. 506, 509, 511, 514, 516, 518, 521, 524, 533, 537, 547). In November 2017, Plaintiff presented complaining of worsening depression after his sister stopped talking to him. (R. 524). Plaintiff was noted to be tired looking, had poor to fair eye contact, a depressed affect, poor focus, and poor attention and concentration. (*Id.*).

In April and May 2018, NP Khalil noted that Plaintiff was anxious about needing to find a new place to live because his father was moving. (R. 509, 514). Plaintiff reported being anxious because he had never lived on his own before. (R. 514).

In July 2018, NP Khalil completed a medical source statement assessing Plaintiff's mental limitations. (R. 581–84). NP Khalil found that Plaintiff had "mild limitations" to understanding very short and simple instructions. (R. 582). He assessed that Plaintiff had "moderate limitations" to: carrying out short and simple instructions; maintaining attention and concentration for extended periods; making simple work-related decisions; asking simple questions or requesting assistance; and maintaining socially appropriate behavior. (*See id.*). He further opined that Plaintiff had "marked limitations" to: understanding and remembering detailed instructions; carrying out detailed instructions; maintaining regular attendance and acceptable punctuality; interacting with the general public; accepting instructions and responding appropriately to criticism from supervisors; and setting realistic goals and making plans independently of others. (*Id.*). NP Khalil opined that Plaintiff was "moderately to extremely limited" in his ability to "tolerate normal levels of stress." (R. 584).

### 5. Psychiatric Consultative Examination

In August 2016, Plaintiff presented to Alison Murphy, Ph.D. for a consultative psychiatric evaluation. (R. 472–77). Plaintiff reported suffering from anxiety disorder, depressive disorder, and autism spectrum disorder. (R. 472). Plaintiff described having depressive symptoms such as hopelessness, loss of usual interests, irritability, fatigue, loss of energy, diminished self-esteem, concentration difficulties, and social withdrawal. (R. 473). He endorsed symptoms of anxiety disorder such as excessive apprehension and worry, irritability, nightmares, hyperstartle response, restlessness, muscle tension, and hypervigilance. (*Id.*). Plaintiff denied any suicidal ideation. (*Id.*). Plaintiff reported to Dr. Murphy that he can dress, bathe, and groom himself appropriately, but noted that it is difficult for him to get motivated to do household chores. (R. 474). He stated that he does not cook, clean, or do

laundry due to lack of motivation.  (*Id.*).  Plaintiff stated that his father manages his money and does all of the shopping for him.  (*Id.*).  Plaintiff reported that he has strong and positive relationships with his family, but he noted that he does not have many friends.  (R. 475).

Dr. Murphy noted that Plaintiff's demeanor was "cooperative," his manner of relating and social skills were "adequate," his eye contact was "appropriate," and his dress and personal hygiene were "neat [and] casual."  (R. 473).  She noted that Plaintiff's thought processes were "coherent and goal directed."  (R. 474).  She observed that his affect was "of full range and appropriate in speech and thought content."  (*Id.*).  Dr. Murphy assessed that Plaintiff's mood was "neutral," his memory was "intact," and his attention and concentration were "impaired due to limited intellectual functioning."  (*Id.*).  She described his insight and judgment as "fair," his intellectual functioning as "average," and his general fund of information as "appropriate."  (*Id.*).

Dr. Murphy's medical source statement assessed that:

> Follow and understand simple directions and instructions: No evidence of limitations.  Perform simple tasks independently or need supervision: No evidence of limitations.  Maintain attention and concentration: Markedly limited.   Able to maintain a regular schedule: No evidence of limitations.  Learn new tasks: No evidence of limitations.   Perform complex tasks independently or need supervision: No evidence of limitations.   Make appropriate decisions: No evidence of limitations.   Relate adequately with others: No evidence of limitations.  Appropriately deal with stress: No evidence of limitations.  Difficulties are caused by lack of motivation, cognitive deficits, and psychiatric diagnoses.

(R. 475).  She found that Plaintiff's prognosis was "fair," and recommended that Plaintiff "should continue with psychological and psychiatric treatment as currently provided."  (*Id.*).

### 6. Physical Consultative Examination

In August 2016, Plaintiff presented to George Wootan, M.D. for a consultative internal medicine examination. (R. 478–81). Plaintiff reported that his chief complaint was that he "has an occasional pulled muscle in his back." (R. 478). Plaintiff reported that he could do some cooking, but noted that he "did not do much in the way of cleaning, laundry, or shopping because of his OCD and anxiety." (R. 479). Plaintiff reported that he showers and gets himself dressed without assistance, and spends most of his time watching television, listening to the radio, and going to therapy appointments. (*Id.*).

Plaintiff's physical examination was generally unremarkable. (*See* R. 478–81). Dr. Wootan reported that Plaintiff is obese, noting that he weighs 250 pounds and is six feet tall. (R. 479). Plaintiff exhibited full strength, full range of motion, and full flexion and extension in his lumbar and cervical spines. (R. 480). Dr. Wootan's medical source statement concluded that Plaintiff "would have no restrictions regarding speaking, seeing, hearing, handling, reaching, kneeling, carrying, lifting, bending, climbing stairs, walking, standing, or sitting." (*Id.*). Dr. Wootan assessed that Plaintiff's prognosis was "fair." (*Id.*).

### 7. State Agency Consultant

In August 2016, State agency psychologist T. Bruni, Ph.D. reviewed Plaintiff's initial application for disability benefits. (R. 79–110). Dr. Bruni did not examine Plaintiff, but based his evaluation on the medical evidence of record, including the consultative examinations and treatment notes from Spectrum Behavioral Health and Drs. Cosgrove and Gallagher. (R. 80–83, 95–98). Dr. Bruni determined that Plaintiff's medically determinable impairments included affective disorder, anxiety, and autism disorder. (R. 85, 100). Dr. Bruni found that Plaintiff's conditions did not meet the Listing criteria because they only caused "moderate limitations" in

Plaintiff's ability to carry out activities of daily living and maintain social functioning, concentration, persistence and pace.  (R. 85, 100).  Dr. Bruni noted that Plaintiff was last employed as a seasonal landscaper, and left because the season ended.  (R. 89, 105).  Dr. Bruni opined that Plaintiff could "understand and remember only simple instructions and procedures," "sustain [concentration for] a normal workday and work week," and "deal with minor changes in an ordinary work setting."  (R. 90, 105).  Dr. Bruni added that Plaintiff "would benefit from an environment in which he is precluded from intensive social interaction."  (*Id.*).

### 8.  Third-Party Testimony

Plaintiff's mother testified as a witness at the administrative hearing and also provided a written statement about her son's mental limitations.  (R. 66–72, 288–90).  She stated that Plaintiff's social anxiety "blocks him from being able to interact in any kind of . . . social setting or [ ] in the work setting."  (R. 66).  She described Plaintiff as a "high functioning autistic," and noted that his conditions "prevent him from being able to follow through on . . . what would be a normal task."  (R. 68–69).  She explained that Plaintiff "has always had black and white, rigid rules about what should be happening," and stated that Plaintiff's conditions make it so he "can't function."  (R. 72).  She explained that the severity of Plaintiff's conditions vary over time, and noted that he has experienced periods of improvement, but those were followed by stages where his functioning has "slumped back" to his former level. (R. 288–90).

Plaintiff's sister also provided a written statement about her brother's limitations.  (R. 291–96).  She described Plaintiff's struggle with his conditions, and stated that his social isolation and anxiety contribute to "unhealthy coping mechanisms, like excessive video game playing and lack of self-care."  (*Id.*).

### D.      ALJ's Decision Denying Benefits

On September 11, 2018, the ALJ issued a decision denying Plaintiff's application for

disability benefits.  (R. 15–33).  At step one of the five-step evaluation process, the ALJ

determined that Plaintiff met the insured status requirements of the Social Security Act through

December 31, 2017, and that he had not engaged in any substantial gainful activity since

November 10, 2014, the alleged onset date of his disability.  (R. 17).

At step two, the ALJ found that, under 20 C.F.R. §§ 404.1520(c), 416.920(c), Plaintiff

had six "severe" impairments: autism spectrum disorder; anxiety; depression; obsessive-

compulsive disorder; insomnia; and irritable bowel syndrome.  (R. 17–18).

At step three, the ALJ found that, while severe, Plaintiff did not have an impairment or

combination of impairments that met the criteria for one of the impairments listed in 20 C.F.R.

Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d),

416.925, and 416.926).  (R. 18–21).  The ALJ assessed that Plaintiff had "no more than mild

limitation" to understanding, remembering, or applying information, and that he had "moderate

limitations" to social interaction, concentration, and adaptation.  (R. 20).

Before proceeding to step four, the ALJ assessed Plaintiff's residual functional capacity

("RFC"), finding that:

> [Plaintiff] has the [RFC] to perform a full range of work at all
> exertional levels but with the following nonexertional limitations:
> He should avoid unprotected heights and hazardous machinery.  He
> must be permitted ready access to a bathroom and be permitted to
> be off task up to 5% of the workday in addition to regularly
> scheduled breaks.  He is limited to understanding, remembering and
> carrying out simple routine tasks in a low stress job defined as
> having changes in work setting and decision making related to
> simple routine tasks, superficial interaction with the general public
> and occasional interaction with coworkers and supervisors.

(R. 21).  The ALJ's supporting analysis explains that his assessment was "based on all the evidence with consideration of the limitations and restrictions imposed by the combined effects of all the claimant's medically determinable impairments."  (*Id.*).

At step four, the ALJ determined that Plaintiff would be unable to perform any of his past relevant work as a cashier checker because the demands of that work would exceed the demands of the unskilled work assessed in the RFC determination.  (R. 31).

At step five, despite Plaintiff's inability to perform his past relevant work, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.  (R. 31–32).  Based on Plaintiff's age, education, RFC, and work experience, as well as testimony from the vocational expert, the ALJ found that Plaintiff would be able to work as a laundry laborer, cleaner, or small products assembler.  (R. 32).  Therefore, the ALJ determined that Plaintiff was not disabled under the Social Security Act.  (*Id.*).

## III.   DISCUSSION

### A.   Disability Standard

To be considered disabled, a claimant must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  In addition, the claimant's impairment(s) must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 1382c(a)(3)(B).

The SSA uses a five-step process to evaluate disability claims:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [*per se*] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Selian v. Astrue*, 708 F.3d 409, 417–18 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also* 20 C.F.R. § 404.1520. The Regulations define residual functional capacity as "the most [a claimant] can still do despite [their] limitations." 20 C.F.R. § 404.1545. In assessing the RFC of a claimant with multiple impairments, the SSA considers all "medically determinable impairments," including impairments that are not severe. *Id.* at § 404.1545(a)(2). The claimant bears the burden of establishing disability at the first four steps; the Commissioner bears the burden at the last. *Selian*, 708 F.3d at 418.

In deciding a disability claim, an ALJ is tasked with "weigh[ing] all of the evidence available to make an RFC finding that [is] consistent with the record as a whole," even if that finding does not perfectly correspond with any of the opinions of cited medical sources. *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013). However, an ALJ is not a medical professional, and "is not qualified to assess a claimant's RFC on the basis of bare medical findings." *Ortiz v. Colvin*, 298 F. Supp. 3d 581, 586 (W.D.N.Y. 2018). In other words, there must be substantial evidence to support a finding of functional limitations or lack thereof.

Relatedly, under the treating physician rule, an ALJ owes "deference to the medical opinion of a claimant's treating physician[s]." *Church v. Colvin*, 195 F. Supp. 3d 450, 453 (N.D.N.Y. 2016) (citing *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)).  However, "[w]hen a treating physician's opinion is not consistent with other substantial evidence in the record, such as the opinions of other medical experts, . . . the hearing officer need not give the treating source opinion controlling weight." *Id.*  When a treating physician's opinions are disregarded, the ALJ must provide "good reasons" for doing so. *See* 20 C.F.R. § 404.1527(d).

Recently, in *Estrella v. Berryhill*, the Second Circuit reiterated its mandate that ALJs must follow specific procedures in determining the appropriate weight to assign a treating physician's opinion. *See generally* 925 F.3d 90, 95–98 (2d Cir. 2019).  The Circuit described the applicable standard, writing that:

> First, the ALJ must decide whether the opinion is entitled to controlling weight.  "[T]he opinion of a claimant's treating physician as to the nature and severity of [an] impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'"  *Burgess*, 537 F.3d at 128 (third brackets in original) (quoting 20 C.F.R. § 404.1527(c)(2)).  Second, if the ALJ decides the opinion is not entitled to controlling weight, it must determine how much weight, if any, to give it.  In doing so, [the ALJ] must "explicitly consider" the following, nonexclusive "*Burgess* factors": "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (per curiam) (citing *Burgess*, 537 F.3d at 129 (citing 20 C.F.R. § 404.1527(c)(2))).  At both steps, the ALJ must "give good reasons in [its] notice of determination or decision for the weight [it gives the] treating source's [medical] opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam) (quoting 20 C.F.R. § 404.1527(c)(2)).

*Id.* at 95–96.  The Circuit also noted that "[a]n ALJ's failure to 'explicitly' apply the Burgess factors when assigning weight at step two is a procedural error."  *Id.* (citing *Selian*, 708 F.3d at 419–20).  If the Commissioner has not otherwise provided "good reasons" for the weight given, the error is not harmless, and remand is necessary for the Commissioner "to 'comprehensively set forth [its] reasons.'"  *Id.* (citing *Halloran*, 362 F.3d at 32–33).

### B.   Standard of Review

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether Plaintiff is disabled.  Rather, the Court must review the administrative record to determine whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied."  *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009).

When evaluating the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."  *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)).  The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is based upon a legal error.  42 U.S.C. § 405(g); *Selian*, 708 F.3d at 417; *Talavera*, 697 F.3d at 151.  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447–48 (2d Cir. 2012) (quoting *Moran*, 569 F.3d at 112).  The substantial evidence standard is "very deferential," and the Court may only reject the facts found by the ALJ "if a reasonable factfinder would *have to conclude otherwise*."  *Id.* at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).

### C.      Analysis

Plaintiff asserts two arguments challenging the Commissioner's denial decision: (1) "[t]he ALJ's step three [Listing] findings and step four RFC assessment are not supported by substantial evidence"; and (2) "[t]he ALJ ignored the treating physician rule."  (*See generally* Dkt. No. 9).  Essentially, Plaintiff contends that the ALJ lacked substantial evidence to find that Plaintiff had only moderate limitations in social interaction, concentration, and adaptation, particularly since his treating providers assessed more severe limitations in these areas and their opinions should have been given more weight.  (*Id.*).  In response, the Commissioner contends that the ALJ's findings are supported by substantial evidence and that ALJ provided good reasons for the weight given to Plaintiff's treating providers' opinions.  (Dkt. No. 10).

After careful review of the record, the Court does not find substantial evidence to support the ALJ's determination that Plaintiff had only moderate limitations in social interaction, concentration, and adaptation.  (*See* R. 19–20).  The ALJ's decision relies heavily on assessments from non-treating and non-examining consultants, Plaintiff's intermittent improvement in his anxiety symptoms, and certain daily activities such as playing videogames and driving to therapy appointments.  (R. 21–31).  However, this evidence lacks any basis in the opinions from Plaintiff's treating providers and is inconsistent with the record as a whole.

For example, the ALJ found that Plaintiff was able to leave the house "unaccompanied" and that he was able to "drive himself to his appointments, [and] shop in stores for his needs," (R. 26–27), suggesting that Plaintiff was largely independent, whereas his treating providers reached the opposite conclusion.  Notably, Dr. Gallagher, Plaintiff's long-time treating psychotherapist who saw Plaintiff twice a week for almost two years, assessed that he was "unable to engage in non-family activities outside the house," and noted that he "fears [he] will

18

be socially judged and humiliated and therefore, avoids social situations such as grocery shopping." (R. 465). Although Dr. Gallagher noted that his "treatment ha[d] progressed to driving independently to [therapy] sessions," she found that Plaintiff was still limited in his ability to adapt in a work setting "because he becomes anxious in social exchanges" which would make it "difficult for him to interact with others and function independently in a workplace." (R. 465, 467). Dr. Gallagher also assessed that Plaintiff "dislikes being around other people except for his family," and that "he can initially get along but cannot sustain interactions." (R. 466).

Dr. Gallagher's opinions are consistent with NP Khalil's assessments that Plaintiff had "marked" limitations to: 'interacting appropriately with the general public," "performing activities within a schedule, maintain[ing] regular attendance and be[ing] punctual within customary tolerances" and "accept[ing] instructions and responding[ing] appropriately to criticism from supervisors." (R. 582–83). Notably, NP Khalil's findings were based on regular counseling appointments from June 2017 through July 2018. (R. 506–56, 581–84). Similarly, Dr. Cosgrove opined that Plaintiff demonstrated "poor social skills," "cognitive rigidity," and "poor" hygiene and self-care. (R. 470). Dr. Cosgrove also noted that Plaintiff was "very dependent on [his] parents," and that his "social and sensory stressors" would prevent him from maintaining employment. (*Id.*). She found that Plaintiff had "obsessive interests" and noted that his "strong sense of fairness leads to inflexible behaviors." (R. 471).

In addition to these opinions, Plaintiff testified that his social anxiety prevents him from going to the store, and that he does not leave the home alone except to attend his therapy sessions. (R. 46, 58, 243, 247). His testimony is consistent with his mother's statements that Plaintiff has "an extreme inability to leave the house and to even [ ] go and get himself

something from the store."  (R. 68).  Plaintiff's sister also noted that he "isolates in his room, rarely emerging," and that "[i]t still takes extreme effort for [Plaintiff] to do normal things like make and get to appointments."  (R. 289).

Taken together, the witness testimony and the opinions from Plaintiff's treating providers all flatly contradict the ALJ's finding that Plaintiff had only moderate limitations with regard to social interaction and adaptation.  (R. 20).  Indeed, Plaintiff's treating providers consistently found that his mental conditions would cause significant limitations in these areas and would greatly diminish his ability to meet the demands of regular employment.  (*See, e.g.*, R. 465–67, 469–71, 581–83).

Moreover, the ALJ did not give adequate reasons for rejecting the opinions of Plaintiff's treating providers.  The ALJ's decision simply adopts the position of the consultative examiners and non-examining State agency expert, while disregarding *all* of Plaintiff's treating providers' opinions that his conditions caused serious limitations in his ability to adapt and function in a work setting on a regular basis.  And the reasons given by the ALJ for rejecting the latter opinions do not stand up to scrutiny.[1]  Further, the decision does not account for key factors that support the treating physicians' assessments, particularly the overall consistency among their opinions.  *See Estrella*, 925 F.3d at 95–96 (citing, *inter alia*, 20 C.F.R. § 404.1527(c)(2)).  Indeed, the treating providers were unanimous in their opinions that Plaintiff has significant mental limitations to social functioning and adaptation necessary for work.  (*See* R. 465–67, 469–71, 581–83).

---

[1] As an example, the Court notes that the ALJ frequently refers to Plaintiff's ability to "drive himself to appointments, [and] shop in stores for his needs" (*see, e.g.*, R. 26), but that evidence appears to have been selectively pulled from just *two* of NP Callahan's treatment notes, (*see* R. 441–42).  Indeed, a fair reading of the record as a whole shows that Plaintiff and others consistently reported that he was completely unable to shop in stores for most of the period under review and was generally unable to leave the home (except to attend therapy appointments) due to his social anxiety.  (*See* R. 58, 68, 439, 444, 568–70, 573–75).

In sum, the Court finds that the ALJ's decision is not supported by substantial evidence and did not properly apply the treating physician rule.  Because these two concepts are related, remand is necessary here for the ALJ to re-weigh the evidence, particularly the opinions of Plaintiff's treating providers, and reassess the Listing and RFC determinations, drawing a clear link to the supporting evidence.  *See Miller v. Colvin*, 122 F. Supp. 3d 23, 29 (W.D.N.Y. 2015) (remanding where the ALJ relied heavily on plaintiff's daily activities and "did not explain how the performance of these limited activities of daily living translates into the ability to perform substantial gainful work"); *see also Oakes v. Comm'r of Soc. Sec.*, No. 15-CV-1246, 2017 WL 9509956, at *7, 2017 U.S. Dist. LEXIS 37868, at *18–21 (N.D.N.Y. Jan. 18, 2017) (remanding for further proceedings where the ALJ's decision failed to provide adequate explanations for discrediting the social limitations assessed by treating physicians, and otherwise indicated a selective reading of the record).

## IV.   CONCLUSION

For the foregoing reasons it is

**ORDERED** that the Commissioner's decision is **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum-Decision & Order; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**

Date:   May 1, 2020
        Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge